UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| PHILIP M. SEBOLT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:20-cv-00009-JMS-MJD |
| ) | |
| UNITED STATES OF AMERICA in its official ) capacity, ) | |
| ) | |
| Defendant. ) | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Philip M. Sebolt, a federal inmate, alleges that he is entitled to monetary relief because he received delayed treatment for a decaying tooth. The United States of America is allegedly liable under the Federal Tort Claims Act ("FTCA") based on the theory that the delay in treatment caused him pain and ultimately resulted in the loss of the tooth.

The United States has moved for summary judgment. For the reasons that follow, the motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

**I.     SUMMARY JUDGMENT STANDARD**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

1

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

In this case, Mr. Sebolt failed to respond to the summary judgment motion. Accordingly, facts alleged in the motion are "admitted without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f); see S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify disputed facts). "Even where a non-movant fails to respond to a motion for summary judgment, the movant still has to show that summary judgment is proper given the undisputed facts." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (cleaned up).

## II.     PROCEDURAL HISTORY

Mr. Sebolt initially filed his claim in the District Court for the Eastern District of Virginia. Dkt. 1. The complaint alleged that the United States, acting through dental personnel at the Federal Correctional Institution Petersburg in Hopewell, Virginia ("FCI Petersburg"), and the Federal Correctional Institution in Terre Haute, Indiana ("FCI Terre Haute") had been negligent with

2

respect to their provision of dental care to Mr. Sebolt between January and February of 2013 while he was incarcerated at FCI Petersburg and between March of 2013 and December of 2016 while he was incarcerated at FCI Terre Haute. *Id.* at 4-7, ¶¶ 13-33.

On January 6, 2020, the Eastern District of Virginia granted partial summary in favor of the United States and dismissed Mr. Sebolt's claims relating to his time at FCI Petersburg because they were time-barred. Dkt. 42 at 9. It then transferred the case to this district. *Id*.

### III.  FACTUAL BACKGROUND

Mr. Sebolt has been housed in approximately five different federal prisons. Dkt. 97-1 at 11−12. He participated in admissions and orientation training upon his arrival at most of those facilities. *Id*. That training included education regarding the operation of Bureau of Prisons ("BOP") dental services, including how to access those services. *Id*. at 13. Mr. Sebolt has been familiar with the operation of the BOP dental sick call program since at least 2013. *Id*. at 27−28.

**A.  BOP Dental Services Policy**

The BOP Program Statement on Dental Services, 6400.03 (USA-0004340460, the "BOP Dental Services Policy"), governs the provision of dental care to inmates within the BOP. Under the policy, any inmate seeking comprehensive dental care may request care by submitting an Inmate Request to Staff Form or other form authorized by local policy and procedures. Dkt. 97-4 at 4.[1] "Comprehensive dental care" is defined as non-urgent treatment procedures such as diagnostic exams, preventive services, and routine dental procedures including resin fillings, temporary crowns, root canals, and oral surgery. BOP Dental Services Policy, at 14−16, § 9(c). Inmates seeking comprehensive dental care are placed on the "[Electronic Medical Record]

---

[1] The United States cites to the BOP Dental Services Policy in Dr. Oldham's expert report. The policy is also available on the BOP's website. Federal Bureau of Prisons, "BOP Policies," https://www.bop.gov/PublicInfo/execute/policysearch?todo=query (search for "6400.03 Dental Services"). The Court cites to the policy as needed.

3

National Waiting List" and are seen based on the order of their placement on the list. Dkt. 97-4 at 4. The date the inmate is placed on the list follows the inmate from one facility to another. *Id.*

The waiting list does not apply to urgent dental care. BOP Dental Services Policy at 19, § 10(a). "Urgent dental care includes treatment for relief of severe, acute dental pain, traumatic injuries, and acute infections exhibiting the cardinal signs of infection. This includes a palliative treatment intervention that may include . . . extraction of non-restorable teeth[.]" *Id.* "Urgent dental care is the highest priority[,]" and can be requested by inmates on a 24-hour basis. *Id.* Inmates must be seen by a dentist within three business days of an initial clinical encounter, and maintaining a wait list for urgent care is prohibited. *Id.*

An inmate who refuses part of a recommended treatment plan when receiving comprehensive dental care "is still eligible for urgent dental care." *Id.* at 18, § 9(g)

### B. Treatment at FCI Petersburg

On February 3, 2013, Mr. Sebolt submitted a cop-out, or inmate request, for dental sick call urgent care. Dkt. 97-6. In order to alert FCI Petersburg staff that he had an urgent and painful dental condition that required immediate care, Mr. Sebolt wrote, "Cop-out Sick Call Dental" at the top of that document, and in the body wrote, "I need a filling for a tooth that is in pain." *Id.*; dkt. 97-1 at 40−42.

Dental staff received the cop-out on February 5, 2013, and Mr. Sebolt received dental treatment later that day. Dkt. 97-6; dkt. 97-1 at 44. Dentist Dr. Giardino determined that one of Mr. Sebolt's upper-right molars, "Tooth #5," had decay on the surface with exposure of root surface. Dkt. 1 at 4, ¶ 15; dkt. 97-11. Dr. Giardano filled Tooth #5's cavity with a temporary resin and instructed Mr. Sebolt to request to be placed on the wait list to obtain a permanent restoration.

Dkt. 1 at 4−5, ¶¶ 17−18. Mr. Sebolt submitted a cop-out later that day, requesting to be placed on the wait list for routine dental care and permanent restorations. *Id.* at ¶ 18; dkt. 97-7.

The temporary resin fell out of Tooth #5 three days after Mr. Sebolt's appointment with Dr. Giardino. Dkt. 1 at 4, ¶ 17.

### C. Requests after Transfer to FCI Terre Haute

Mr. Sebolt was transferred to FCI Terre Haute in March 2013. *Id.* at 5, ¶ 19. Dr. Giardino and the rest of the FCI Petersburg dental staff did not order any follow-up care for Tooth #5, so FCI Terre Haute dental staff were not aware of Mr. Sebolt's need for restorative dental care for that tooth. Dkt. 97-12 at 8; dkt. 97-1 at 36.

On April 30, 2013, Mr. Sebolt submitted his first cop-out for dental care after arriving at FCI Terre Haute. Dkt. 1 at 5, ¶ 20; dkt. 97-8. The cop-out stated, "Requesting to be placed on the waiting list for routine care (cleaning & perm. restorations)." Dkt. 97-8. It did not disclose the fact that Tooth #5's temporary resin had fallen out. *Id.* FCI Terre Haute staff replied that Mr. Sebolt was already on the wait list based on the February 5, 2013, cop-out submitted at FCI Petersburg. *Id.*

Around March of 2014, Mr. Sebolt began experiencing pain in Tooth #5. Dkt. 97-1 at 54−55. On March 10, he submitted another dental care cop-out relating to dental care. Dkt. 1at 5, ¶ 21. That cop-out did not specifically identify Tooth #5, contain any language suggesting an urgent or acute need for dental care, disclose the fact that Tooth #5's temporary resin had fallen out, or state that he was in pain. Dkt. 97-9; dkt. 97-1 at 56−57. Instead, it stated only, "I am cop[p]ing out to confirm that I am still on the waiting list to have my cavities filled w/ perminent [sic] fillings. I have been waiting for over a year now! Please tell me where I am on the waiting list." Dkt. 97-9. In response to the cop-out, dental staff informed Mr. Sebolt that he was on the waiting list,

5

which was up to 18 months long, and he would be seen in order of his request. *Id.* Mr. Sebolt did not react to that response by submitting a new request for care to BOP staff to alert them to the condition of Tooth #5 or his related pain. Dkt. 97-2 at 3−4.

Mr. Sebolt did not make another request related to his dental care until November 26, 2014. Dkt. 97-1 at 16−17. At that time, Mr. Sebolt submitted an administrative remedy form in which he stated that the nature of his complaint was, "Not receiving dental care. My filling fell out a couple of years ago and I have been on the waiting list February 2013. I am in pain." Dkt. 97-10. In response, dental staff wrote, "You signed up for dental cleaning only in Feb. 2013. You must sign up for dental sick call if you are experiencing pain or any other issues." *Id.*

At some point between November 26, 2014, and December 10, 2014, Mr. Sebolt submitted a new dental sick call request for urgent care for Tooth #5. Dkt. 97-1 at 58−60. That dental sick call request was the first dental sick call request Mr. Sebolt had submitted that referenced Tooth #5 since February of 2013. *Id.* at 59.

In response to that dental sick call request, Mr. Sebolt was seen by FCI Terre Haute dentist Dr. Doug Shepherd on December 10, 2014. Dkt. 1 at 6, ¶ 24. At the appointment, Dr. Shepherd determined that Tooth #5 was non-restorable and that an extraction was necessary. *Id*. Mr. Sebolt, however, rejected Dr. Shepherd's medical advice and declined to proceed with the extraction because he wanted to see whether a false tooth was allowed. *Id.* at 6, ¶ 25.

Mr. Sebolt admitted that if he had complied with that recommendation, his tooth would have been extracted, and he would not have experienced any further complications relating to it. Dkt. 97-1 at 86.

Mr. Sebolt does not know when Tooth #5 became non-restorable, and admitted that it might have been any time in 2013. *Id.* at 38−39. He acknowledged that the tooth may already

6

have been non-recoverable by the time he arrived at FCI Terre Haute. *Id*. at 45. He also admitted that he believed that the negligence of FCI Petersburg staff caused him to lose Tooth #5, and that if they had provided him with non- negligent dental services, he would not have lost it. *Id*. at 36−37.

### D. Subsequent Treatment

After rejecting Dr. Shepherd's recommendation that Tooth #5 be extracted in December of 2014, Mr. Sebolt lived with the non-recoverable tooth for approximately two more years.[2] Dkt. 1 at 6, ¶ 26. On October 3, 2016, Mr. Sebolt was eating a meal when Tooth #5 broke in half. *Id.* Mr. Sebolt signed up for dental sick call on October 5, *id.* at ¶ 27, but no copy of that sick call request exists, dkt. 97-1 at 88−89. In addition, Mr. Sebolt does not remember any specifics regarding its form or content. *Id.* at 89−90.

On October 7, 2016, Mr. Sebolt bit into the remainder of Tooth #5 during lunch, which caused the condition of the tooth to change in two significant ways: it "jab[bed] into the surrounding gum tissue/root causing an excruciating pain," and the tooth thereafter became loose enough to obstruct his bite. *Id.* at 93. Mr. Sebolt told Correctional Officer Frank Hart about his dental condition that same day, and Officer Hart referred Mr. Sebolt to Correctional Officer Travis Weber. Dkt. 1 at 6, ¶ 29. Mr. Sebolt says that Officer Weber did not contact anyone about his condition. *Id*. at 6-7, ¶ 30. Mr. Sebolt acknowledged that correctional staff is not responsible for his dental care, but they could have informed medical staff of the situation. Dkt. 97-1 at 101−02.

Mr. Sebolt claims that later that same day, he also informed Assistant Health Services Administrator ("HSA") C. McCoy regarding his dental condition, but that HSA McCoy also

---

[2] Mr. Sebolt does not seek recovery for any injury relating to Tooth #5 between December of 2014 and October 3, 2016. Dkt. 97-1 at 24.

did not take any action. Dkt. 1 at 7, ¶ 31. Instead, Mr. McCoy told him, "[W]hen kids begin losing their teeth, you tell them to wiggle it and work it out," implying Mr. Sebolt should pull the tooth himself. *Id.* HSA McCoy told Mr. Sebolt that the condition did not qualify as emergency dental care. *Id.* at 7, ¶ 32. The remaining part of the tooth fell out on its own on November 20, 2016. *Id.* at 7, ¶ 33.

Mr. Sebolt was seen by Dr. Shepherd on December 16, 2016, and Dr. Shepherd extracted the remaining root of Tooth #5. *Id*; dkt. 97-12 at 18. According to Dr. Shepherd's treatment notes, Mr. Sebolt's dental sick call request stated, "This tooth broke off at gum." Dkt. 97-12 at 18.

### E. Dr. Oldham's Expert Report

Dr. James Oldham, D.D.S., is a dentist and clinical professor at the Indiana University School of Dentistry. Dkt. 97-4 at 3. He reviewed Mr. Sebolt's medical records and submitted an expert report with his conclusions about Mr. Sebolt's condition and care. *Id.*

Dr. Oldham could not determine with any certainty whether Tooth #5 could have been saved had Mr. Sebolt received earlier treatment, "even though earlier intervention could have increased the odds of saving the tooth." *Id.* at 6. He concluded that the order in which Mr. Sebolt was seen was consistent with the EMR National Wait List, and there was no evidence that dental staff at FCI Terre Haute intentionally delayed treatment. *Id.* There was no documentation in the record that Mr. Sebolt submitted any complaint to FCI Terre Haute staff indicating he needed urgent care rather than routine care before November 26, 2014. *Id.* At that point, Mr. Sebolt was advised he should sign up for sick call. He did so "and was evaluated shortly thereafter on December 10, 2014." *Id.*

Further, Dr. Oldham concluded that any injuries that Mr. Sebolt suffered after December 10, 2014, were caused by Mr. Sebolt's refusal to have Dr. Shepherd extract Tooth #5 at the December 10 visit. *Id.* "Any injuries or infections, pain, etc. associated with tooth #5 occurring after that date would have been prevented had the tooth been extracted at that time." *Id.*

### IV.  DISCUSSION

Mr. Sebolt is proceeding on a negligence claim against the United States under the FTCA. He alleges that staff at FCI Terre Haute were negligent for failure to provide adequate dental care for two timeframes: (1) from March 2013, when he was transferred to FCI Terre Haute after receiving the temporary filling at FCI Petersburg, through December 2014, when he saw Dr. Shepherd; and (2) from October 5, 2016, when he submitted his dental sick call request, and December 16, 2016, when what remained of Tooth #5 was extracted. Additionally, Mr. Sebolt alleges two distinct injuries: the loss of Tooth #5, and the pain he experienced when awaiting care for Tooth #5.

#### A.  FTCA Standard

The FTCA is a limited waiver of the United States' sovereign immunity. The FTCA applies to federal inmates' claims alleging personal injuries sustained while incarcerated because of negligence of government employees. *See United States v. Muniz*, 374 U.S. 150 (1963). The FTCA authorizes suits against the United States for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable." 28 U.S.C. § 1346(b).

Whether a FTCA claim can be made against the United States depends on whether a private entity under like circumstances would be liable "in accordance with the law of the place where the

9

act or omission occurred." 28 U.S.C. § 1346(b). Because the actions Mr. Sebolt complains of occurred in Indiana, Indiana state law applies to this case.

The United States argues that to survive summary judgment, Mr. Sebolt must have evidence to support a medical malpractice claim. The elements of such a claim are "'1) that the [United States] owed a duty to the plaintiff; (2) that the [United States] breached that duty; and (3) that the breach proximately caused the plaintiff's injuries.'" *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016) (quoting *Mayhue v. Sparkman*, 653 N.E.2d 1384, 1386 (Ind. 1995)).

With the exception of cases where the alleged negligence is of a type that would be readily apparent to a layperson, expert testimony is required to establish a deviation from the standard of care in medical treatment in medical malpractice cases. *See Culbertson v. Mernitz*, 602 N.E.2d 98, 104 (Ind. 1992). Further, to prove causation, a plaintiff must present specific facts that would demonstrate that the defendant's allegedly negligent behavior caused the plaintiff's injuries. *Midwest Commerce Banking Co. v. Livings*, 608 N.E.2d 1010, 1013 (Ind. Ct. App. 1993); *see also Topp v. Leffers*, 838 N.E.2d 1027, 1032 (Ind. Ct. App. 2005) (stating that proving proximate causation requires that the plaintiff show "a reasonable connection between a defendant's conduct and the damages which a plaintiff has suffered"). This too usually requires proof by expert testimony. *See, e.g.*, *Singh v. Lyday*, 889 N.E.2d 342, 357 (Ind. Ct. App. 2008) ("When the issue of cause is not within the understanding of a lay person, testimony of an expert witness on the issue is necessary." (citation omitted)).

### B. Discussion

There is no disagreement that the BOP owed a duty of care to Mr. Sebolt during his incarceration at FCI Terre Haute. 18 U.S.C. § 4042(a)(2) ("The Bureau of Prisons . . . shall provide

suitable quarters and provide for the safekeeping, care, and subsistence of all persons . . . convicted of offenses against the United States. . . ."); *see also Gottlieb v. United States*, 624 F. Supp. 2d 1011, 1025 (S.D. Ind. 2008) ("Indiana law recognizes that a custodian has a legal duty to exercise reasonable care to preserve the life, health and safety of a person in custody.") (internal citations omitted). Rather, the United States argues that neither FCI Terre Haute dental or custody staff breached their duty to Mr. Sebolt and caused his injuries.

**1. Delay of Care Between March 2013 and December 2014**

"Summary judgment is appropriate in a negligence action where defendant demonstrates that the undisputed material facts negate at least one element of plaintiff's claim." *Halterman v. Adams County Bd. of Comm'rs*, 991 N.E.2d 987, 990 (Ind. Ct. App. 2013) (internal quotations omitted). That is the case here. There is no evidence that FCI Terre Haute staff breached their duty to render timely urgent care to Mr. Sebolt. Mr. Sebolt admitted that he had no evidence that FCI Petersburg staff conveyed to FCI Terre Haute staff that he would need urgent care for the filling in Tooth #5. Dkt. 97-1 at 36. The cop-outs Mr. Sebolt submitted to dental staff at FCI Terre Haute on April 30, 2013, and March 10, 2014, requested routine care and status updates for his placement on the waiting list for that routine care. Dkts. 97-8, 97-9. Mr. Sebolt did not say that the temporary filling in Tooth #5 had fallen out, or that he was experiencing any pain. *Id.* Staff could not have breached their duty to provide timely care for an urgent dental need if the urgency was not communicated to them.

Staff were first notified that Mr. Sebolt's filling had fallen out and he was in pain when he submitted a grievance on November 26, 2014. Dkt. 97-10. In response, Mr. Sebolt was told that he needed to sign up for dental sick call. *Id.* At some point between November 26, 2014, and

11

December 10, 2014, Mr. Sebolt did so.[3] Dkt. 97-12 at 16. On December 10, Dr. Shepherd met with Mr. Sebolt and recommended extraction of the tooth because it was non-restorable. *Id.* Mr. Sebolt declined treatment at that time. *Id.* Accordingly, there is no evidence that FCI Terre Haute staff breached their duty to provide timely urgent dental care between February 2013 and December 2014, and summary judgment must be **granted** as to that timeframe.

### 2. Loss of Tooth #5

Additionally, Mr. Sebolt's claim related to the ultimate loss of Tooth #5 fails on the element of causation. Dr. Shepherd determined that Tooth #5 was not restorable as of December 2014, and Mr. Sebolt has presented no evidence to refute this. *See* Dkt. 97-1 at 38−39 (Mr. Sebolt admitted he did not know when tooth became non-restorable). In addition, Dr. Oldham could not determine at what point Tooth #5 became non-restorable. Dkt. 97-4 at 6.

To prove that the loss of this tooth was due to the United State's negligence, Mr. Sebolt was required to submit expert testimony because this knowledge is outside the scope of the understanding of a lay person. *Singh*, 889 N.E.2d at 357. Accordingly, summary judgment must be **granted** as it relates to Mr. Sebolt's claims for recovery for the loss of Tooth #5.

### 3. Delay of Care Between October 5, 2016, and December 16, 2016

The United States argues that Mr. Sebolt cannot recover any damages for the delay in treatment between when he broke his tooth in October 2016 and when he received care because he "did not follow standard protocol for obtaining dental care." Dkt. 98 at 14. But here there is a dispute of material fact.

Mr. Sebolt was previously instructed to sign up for dental sick call when he experiences pain or any other issues. Dkt. 98 at p. 7; dkt. 97-10. Mr. Sebolt testified that Tooth #5 broke in half

---

[3] The copy of the sick call request is not in the record. The treatment notes from the December 10 visit relay the content of the request as follows: "This tooth is hurting." *Id.*

12

while eating on October 3 and that he submitted a sick call request on October 5. Dkt. 1 at p. 6 (signed under penalty of perjury). No copy of the sick call exists, but Dr. Shepherd's treatment notes show that "Patient signed up for dental sick call via CMU unit. 'This tooth broke off at gum.'" Dkt. 97-12 at 18. Based on this evidence, a jury could find that Mr. Sebolt submitted a dental sick call request on October 5th that stated that his "tooth broke off at gum" and that this request for dental sick call was sufficient to put FCI Terre Haute dental staff on notice that Mr. Sebolt's issue involved urgent, rather than routine, care.

The defendant suggests that Mr. Sebolt could have received immediate treatment for his affected tooth if he had used a new dental sick call request on or after October 8, 2016, to report that he was experiencing more pain when he bit into the remainder of Tooth #5 on October 7, causing it to jab into his gum tissue and obstructing his bite. Dkt. 97-1 at 93−94 and 97 (acknowledging Mr. Sebolt could have obtained and completed new dental sick call forms between October 8 and December 16, 2016). But there is no evidence to support the suggestion that Mr. Sebolt was required to file multiple requests for dental care about the same tooth. In addition, the defendant argues that Mr. Sebolt's claim with respect to delay in treatment fails because he did not present expert testimony stating that any delay was sufficiently extreme to violate the standard of care. Dkt. 98 at 15. But a lay person could find that a two-month delay between submitting a dental sick care request form stating one's tooth broke off at the gum and receiving care could result in unnecessary pain.[4] *See Gil v. Reed*, 381 F.3d 649, 661 (7th Cir. 2004) (noting that it was within a layperson's purview to understand that a delay between prescribing a medication and providing a medication could result in pain and spread of infection). And this is especially so given the BOP's Dental Policy that provides that inmates can request urgent dental care at any time, and

---

[4] The Court notes that Dr. Oldham's report did not discuss the standard of care for when a patient should be seen for a tooth that had broken off at the gums.

13

they should be seen by a dentist within three days of their first clinical encounter. BOP Dental Services Policy at 19, § 10(a).

Finally, Dr. Oldham's report states that any pain suffered by Mr. Sebolt after December 2014 was attributable to his refusal to have his tooth removed during his December 10 encounter with Dr. Shepherd. But the BOP Dental Policy provides that an inmate who refuses recommended care can still later request urgent care.

Because there is a dispute of fact as to whether FCI Terre Haute dental or custody staff was negligent by not seeing Mr. Sebolt for over two months after Tooth #5 cracked, summary judgment is **denied** as to his claim for damages for pain for this timeframe.

## V. CONCLUSION

The defendant's motion for summary judgment, dkt. [97], is **GRANTED** as to any claims for the loss of Tooth #5 and for any pain suffered between March 2013 and December 2014.

The motion is **DENIED** as to Mr. Sebolt's claim for damages related to pain suffered between October 5, 2016, and December 16, 2016. This claim will be resolved through settlement or bench trial.

**IT IS SO ORDERED.**

Date: 10/18/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

PHILIP M. SEBOLT
14682-424
TUCSON - USP
TUCSON U.S. PENITENTIARY
Inmate Mail/Parcels
P.O. BOX 24550
TUCSON, AZ 85734

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov